2018 IL App (2d) 170048
No. 2-17-0048
Opinion filed March 23, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-2119 |
| ERIC F. ZIEMBA, | ) ) ) | Honorable Donald M. Tegeler, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Hudson and Justice Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, Eric F. Ziemba, was found guilty of involuntary sexual servitude of a minor (720 ILCS 5/10-9(c)(2) (West 2014)), traveling to meet a minor (*id.* § 11-26(a)), and grooming (*id.* § 11-25(a)).  On appeal, defendant contends that (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of involuntary sexual servitude of a minor and (2) the trial court erroneously admitted certain text messages into evidence.  We affirm.

¶ 2                              I. BACKGROUND

¶ 3 On December 2, 2014, the following advertisement was placed online by an officer from the Aurora Police Department as part of an undercover sting operation conducted with the assistance of special agents from the United States Department of Homeland Security (DHS):

"*******Sweet and juicy cHERRY waiting to be picked**** - 18

Its sooooo cold!!!! Come warm up with a very young and eager co-ed waiting to please and fulfill your every desire. I'm a sexy brunette down for what ever you please. Text at [number omitted]. Gentlemen only..I;m [*sic*] waiting for you. Available all day..$150/h.. 100/hh

Poster's age: 18"

¶ 4 Defendant responded to the advertisement via text message, unaware that he was communicating with Sergeant Alfredo Dean of the Aurora Police Department. The following is the text exchange that occurred between defendant and Dean:

"[DEFENDANT]: Where are you located? Are you a cop?

[DEAN]: near sugar grove and no

[DEFENDANT]: No far. Oswego here

[DEAN]: what r u lookin 4

[DEFENDANT]: What do u offer

[DEAN]: my girls will do what i tell them

[DEFENDANT]: Your girls? So who am I talking to?

[DEAN]: mom

[DEFENDANT]: Ah so are these your daughters?

[DEAN]: yes

[DEFENDANT]: How old are they?  I just want to be sure I am not getting scammed here

[DEAN]: 14 yr and 15 yr

[DEAN]: no scam just xtra x mas $$$

[DEFENDANT]: Your post said 18

[DEFENDANT]: Do you do things?

[DEAN]: I know no just teaching 2day

[DEFENDANT]: Ok.

[DEFENDANT]: Where would this happen?

[DEFENDANT]: ?

[DEAN]: hotel

[DEFENDANT]: In sugar grove?

[DEFENDANT]: Are you interested?

[DEAN]: are u?  we r ready

[DEFENDANT]: I am.  Will you be in the room?

[DEAN]: i will leave and return once time is up

[DEFENDANT]: Can I see a pic of who I would see?  I feel a little nervous about this.  Could be a trap

[DEAN]: no trap pics posted r real

[DEFENDANT]: There is only one

[DEAN]: i know its real

[DEFENDANT]: What is the rate?

[DEAN]: i know its real

[DEAN]: 100 hh 150 h

[DEFENDANT]: You said that already.  What is the rate??

[DEFENDANT]: Oh ok

[DEFENDANT]: What are they able to do!

[DEAN]: 100 hh 150 hh

[DEAN]: anything i tell them to do

[DEFENDANT]: Even each other?

[DEAN]: upcharge each other

[DEFENDANT]: What is that?

[DEAN]: xtra $$ for their show

[DEFENDANT]: I know.  Amount

[DEAN]: $50

[DEFENDANT]: Ok.  So where would I have to go?

[DEAN]: we are near 88/orchard text when ur near

[DEFENDANT]: How many guys have they seen today?

[DEFENDANT]: Why are they not in school)

[DEAN]: we just started day off to make some x tra $$$

[DEFENDANT]: How much xtra do you need?

[DEFENDANT]: You know that no man can touch your daughters because they are under age and it's illegal.

[DEAN]: ur loss

[DEFENDANT]: I didn't say I wasn't coming

[DEFENDANT]: I am trying to understand your reasoning

[DEAN]: making $$ that's all

[DEFENDANT]: Have they done this before?

[DEFENDANT]: Look at it from my standpoint.  I am nervous

[DEAN]: 1 yes and 1 is learning

[DEAN]: they will calm ur nerves

[DEFENDANT]: The older?

[DEAN]: 15 does fs 14 is still learning but great hands

[DEFENDANT]: I am sure they will.  But do u understand why I am asking all these questions?  I want to know that I am going to be safe not arrested or scammed.  You arnulle [*sic*] discrete

[DEFENDANT]: Fs?  Full service?

[DEAN]: all safe here very discreet

[DEAN]: yes on fs

[DEFENDANT]: As long as you can assure me that I will be safe I won't get arrested and no vid or anything after this will happen.  I am a go

[DEAN]: i will see u when u get here all good here

[DEFENDANT]: Is someone else there

[DEAN]: just my daughter and I can stay in room or leave and return when time is up

[DEFENDANT]: Only one daughter?

[DEAN]: both r here

[DEFENDANT]: No one else has asked about your ad

[DEAN]: yes have some appointmnets [*sic*] already which time do u want

[DEFENDANT]: What's open

[DEFENDANT]: I'm half ways there

[DEAN]: how long will u b?

[DEFENDANT]: Well I can try an hour.  But if it's easier I can do half

[DEAN]: we can do either how long b4 u get here

[DEFENDANT]: Where is here

[DEAN]: we r near 88/orchard

[DEFENDANT]: I know where though

[DEAN]: holiday inn

[DEFENDANT]: Really?

[DEFENDANT]: Haha

[DEFENDANT]: Ok then I am here

[DEAN]: ???

[DEFENDANT]: I was at the bank when you said holiday inn so I am here

[DEAN]: in the parking lot?

[DEFENDANT]: Yes

[DEAN]: rm 211 knock on the door and say papa johns

[DEFENDANT]: For real?

[DEFENDANT]: Are you in the room?

[DEAN]: yes

[DEFENDANT]: Why can't I meet you first

[DEAN]: we can talk whn u get here

[DEFENDANT]: See that makes me nervous. Your not helping me feel relaxed. I know the cars outside and one makes me real worried

[DEFENDANT]: As soon as I come in I feel that I am going to get cuffed

[DEFENDANT]: ??

[DEAN]: what cars r u talkin about i don't see anything now ur making me nervous

[DEFENDANT]: Ok. Be honest with me you are not going to have me arrested or I am not going to be on dateline?

[DEFENDANT]: Not trying to make you nervous

[DEAN]: no and no hell no

[DEFENDANT]: Your not part of any undercover thing?

[DEAN]: omg no

[DEFENDANT]: Ok good.

[DEFENDANT]: I just have to make sure I am safe

[DEAN]: me too

[DEFENDANT]: There are people at the front desk. What do I tell them?

[DEAN]: just walk up to room

[DEFENDANT]: Do I have to say papa johns

[DEAN]: im trying to make it look as real as possible

[DEFENDANT]: There is no one in the hallway now. Can't you let me in?

[DEAN]: just knock on door geez"

¶ 5    Defendant entered the hotel room and encountered Melissa Siffermann, a special agent with DHS, who was posing as the mother offering her two daughters for sex. Defendant paid her $150 and was thereafter arrested.

¶ 6    On January 28, 2015, defendant was indicted on one count of involuntary sexual servitude of a minor (*id.* § 10-9(c)(2)), one count of traveling to meet a minor (*id.* § 11-26(a)), and one count of grooming (*id.* § 11-25(a)).

¶ 7    Defendant moved to dismiss count I of the indictment, based on the absence of an actual minor. The trial court denied the motion, stating that the issue was to be determined by the trier of fact.

¶ 8    A bench trial commenced on October 17, 2016, at which the following relevant testimony was provided. Geoffrey Howard, a special agent with DHS, testified that DHS entered into a partnership with the Aurora Police Department to target individuals involved in the sex trafficking of children. On December 2, 2014, they were conducting an operation out of two adjoining rooms in an Aurora hotel. One of the rooms was used as the meeting room for the target and the undercover officer. The other room was considered the control room, where several officers would correspond via text messages with individuals responding to the online ad. Two surveillance cameras had been set up; one camera recorded the hallway outside of the meeting room, and the other camera recorded the inside of the meeting room. Video monitors for the cameras were located in the control room.

¶ 9    Howard testified that, on the day in question, the ad was posted on an escort service webpage called "Backpage.com." Howard testified that the officers used a computer program called "LETS,"[1] which allowed them to respond to incoming texts via computer rather than

---

[1] LETS is an acronym for Law Enforcement Telecommunication System. See All

phone. The program allowed more than one officer to respond to more than one individual using the number placed in the online ad. The program created a record of the incoming and outgoing messages.

¶ 10    Erik Swastek, an officer with the Aurora Police Department, testified that he was the lead investigator in the operation. He prepared the ad that was placed on Backpage.com. He stated that, if an ad included an age younger than 18, the ad would not post. However, he learned from known prostitutes that people trying to find juveniles on Backpage.com looked for people posting as 18-year-olds. Swastek testified that the phone number used was a "spoof number." When someone responded to the ad, the text message would go to a computer in the control room. Swastek would then assign the number to an officer who would then be responsible for communicating with that person. On December 2, 2014, there were four or five "texters" working in the control room. At 12:31 p.m. on December 2, 2014, a text was received in response to the ad. The text was assigned to Dean.

¶ 11    Swastek testified that the text message conversations were preserved on a server through the LETS system. The conversations could be downloaded and printed. There was no way for anyone to change or manipulate conversations on the server. Swastek identified People's exhibit No. 2 as the printout of the text conversation with defendant from the LETS program.

¶ 12    Swastek testified further that, after defendant was arrested, he took defendant's phone and placed it in a bag. He confirmed that the phone was the one used to send the text messages in response to the ad. On December 14, 2014, Swastek hooked the phone up to a Cellebrite Touch Universal Forensic Extraction Device (Cellebrite) and extracted all the data on the phone.

Acronyms, https://allacronyms.com/LETS/Law_Enforcement_Telecommunication_System (last visited Feb. 13, 2018).

Swastek explained that a Cellebrite downloads a phone's data to a computer. Before hooking the phone up to the Cellebrite, Swastek looked at the text message conversation between defendant and Dean that was on the phone. He testified that every part of the conversation was on the phone; nothing had been deleted. Swastek identified People's exhibit No. 6-A as a printout of the text messages from the Cellebrite extraction and People's exhibit No. 5 as a printout of the Cellebrite extraction of the entire contents of the phone. Swastek testified that Officer Benjamin Grabowski took the lead on the Cellebrite extraction and showed Swastek how to do it.

¶ 13    On cross-examination, Swastek was asked about People's exhibit No. 2 and his training on the LETS program. He testified that he was not an expert on the LETS program but that he knew that the text conversations were automatically downloaded to the server. When asked whether he could independently recall whether the information that was saved on the server was exactly the same information retrieved from the phone, he stated:

"If I understood you correctly, when I did the extract, I had the phone in my hand, and I went line by line when I did that and made sure like either he didn't delete something that I would have to account for in my report or that, you know, whatever happens in the magic that is technology something got messed up.

But I went phone to screen, line by line, and made sure it matched exactly."

¶ 14    When the State moved to admit People's exhibit No. 6-A into evidence, defendant objected, stating:

"Judge, I would continue to say that relative to the text messaging, this officer wasn't on the other side of those text messages, so if he could lay a foundation for what somebody else said, I think that's a little bit problematic.

> Once again, I'm not suggesting this is a hard foundation to lay. I'm just saying it's the wrong guy to lay it. Sergeant Dean is the one that was the responder on all of these text messages."

The court withheld ruling, pending testimony from Dean.

¶ 15 Dean testified that he was assigned to respond to the texts coming in from defendant. He responded using his laptop, and the text conversation was recorded through a system on his laptop. The recorded conversation was later downloaded and preserved. Dean testified that he was later able to examine the contents of the recorded conversation and determine that it was recorded accurately. Dean examined People's exhibit No. 2, which he identified as a printout of the recorded conversation, and testified that it appeared to be the entire conversation that he had with defendant.

¶ 16 Dean testified that, while texting with defendant, he advised defendant to knock on the door to the hotel room where defendant was supposed to meet with the "mother." Thereafter, via a video monitor, Dean saw defendant knock on the door and enter the meeting room, where he encountered Siffermann. After having a conversation with her, defendant was arrested. Dean confirmed with Swastek, who had taken defendant's phone, that the phone number matched the phone number he had been texting.

¶ 17 When the State asked to admit People's exhibit No. 2 into evidence, defendant continued his objection, arguing: "[W]e're dealing with a software program where we have not heard how it works, how it was put together, what it shows, whether there's any accuracy involved in it at all." The trial court overruled the objection and admitted the exhibit, stating:

> "I believe the foundation has been laid.

> Specifically, I also rely on the fact that this witness said that he verified what was on the text messages is what he remembered, and I believe the previous witness, Swastek, testified that he actually went line by line between his computer screen and the phone and that they corresponded with each other."

Thereafter, Dean testified as to the contents of the text conversation with defendant.

¶ 18    On cross-examination, Dean testified that he did not personally save the text messages on the server. He assumed that it was automatically done by the LETS program. He agreed that he was not an expert on the LETS program. Dean never compared People's exhibit No. 2 with the text messages on his computer. He could not say that it was exactly the same as what was on his computer.

¶ 19    On redirect examination, Dean testified that the text messages contained in People's exhibit No. 2 were the text messages that he personally sent and received on December 2, 2014.

¶ 20    Following Dean's testimony, defendant renewed his objection to the admission of People's exhibit No. 2. The trial court stated:

> "I'm not going to reconsider it. In going through the facts, what I'm relying on specifically is Swastek testified that they took the phone off of your client, that they secured the phone.

> Swastek then went to the computer and compared line by line the computer and the phone and that they were the same. And then Dean has testified that People's No. 2 was a transcript of basically—as I took it, basically what Swastek compared on the computer and the phone, too. With the comparison being the same, Dean testifying that that was his conversation.

I understand your argument, but I believe the foundation has been laid that that is the true and accurate conversation, and I will not reconsider my position."

¶ 21 Siffermann testified that, on December 2, 2014, she was working undercover, playing the role of a mother offering her two teenage daughters for sex. She did not participate in the texting but was informed by the officers about the general details of the conversations taking place, such as the amount of money to be charged. At about 2:25 p.m., there was a knock on the door of the hotel room being used as the meeting room. Defendant entered, she had a conversation with him, and he gave her $150. The meeting was recorded on video. A copy of the video and a transcript of her conversation with defendant were admitted into evidence. The video was played for the court.

¶ 22 On cross-examination, Siffermann conceded that when defendant entered the room there were no children present and defendant never asked about children. Defendant told her that he was going to do the full hour. They did not discuss specific sexual acts or with whom he was expecting to engage in sexual acts. Siffermann's understanding of their conversation was that he was there to have sex with a minor and that he was nervous about it. Defendant did not use specific words indicating that he was there to have sex with a minor. Her belief that defendant was there to have sex with a minor was based on the contents of the text conversation. Siffermann read the text conversation before meeting with defendant. Based on defendant's stating that he wanted to do the full hour and then paying her $150, Siffermann believed that she and defendant came to an agreement that the money was being exchanged for sexual acts.

¶ 23 Grabowski testified that, on December 14, 2014, he was asked by Swastek to help execute a warrant on an iPhone. Grabowski had been trained on the Cellebrite, which extracts all data from phones, including deleted data, and migrates the data to a computer so that it can be

read in linear format. As of December 2014, he had performed over 50 Cellebrite extractions. Swastek gave him defendant's phone, and with Swastek present he successfully ran the Cellebrite extraction without incident. The data was then downloaded to a disk and given to Swastek.

¶ 24 Defendant testified that he lived in Oswego and had been married for 13 years. On December 2, 2014, he was on his computer at home when he saw the ad placed on Backpage.com. The ad made no reference to children. He responded to the ad by text. Defendant was shown People's exhibit No. 2, which he identified as a transcript of the text messages sent between himself and the recipient, and agreed that it was a true and accurate representation of those text messages. Throughout his testimony, defendant went through the transcript line by line with counsel.

¶ 25 Defendant testified that, when he answered the ad, he believed that he would be getting "just a massage and anything else would be discussed later on." He believed that there was a possibility of a sexual encounter. Defendant testified that, when the "mother" texted, "[m]y girls essentially will do whatever I tell them to," he "was a little thrown off" because the ad referenced a single person. He thought that "she had friends or something." When he asked the mother, " 'Do you do things?' " and she responded, " 'no just teaching 2day,' " he responded " 'Ok.' " By responding "Ok," he was just acknowledging what she said; he was not expressing his intent to have sex with her children. When the mother texted that she was in a hotel, defendant texted " 'Are you interested?' " Defendant was referring to the mother. When the mother responded, " 'Are u? We r ready,' " defendant believed that she was referring to "anything that would transpire between her and [him]." When defendant asked if she would be in the room, it was because he wanted to make sure that he could talk to her and to clarify that his main purpose was

to see her. When the mother told him that she would leave and return when the time was up, "[he] wasn't comfortable with that."

¶ 26 Defendant testified further that he engaged in a dialogue about the daughters because he had "never experienced anything like this, and [he] was just kind of thrown back and/or shocked that a mother would be willing to put their daughters through this." He never agreed to pay $50 for the girls to "do each other." He testified that he "was not interested in doing that. That was never an option. It would never even cross [his] mind." When he asked how many other guys the girls had seen that day and why they were not in school, it was because he was "just kind of shocked." When the mother responded " 'ur loss' " to his comment that touching her daughters was illegal, and defendant texted, " 'I didn't say I wasn't coming,' " it was because he did not want her to get upset. His intent behind continuing the conversation about her daughters was to try to see if he could eventually talk to her alone. When defendant asked about " 'Fs' " regarding the 15-year-old, he was trying to clarify only what the mother meant, not what he expected to happen. His expectation was that he would be seeing the 18-year-old pictured in the ad.

¶ 27 Defendant testified that when he arrived at the hotel room Siffermann told him that her daughter was at the pool. Defendant testified: "That meant perfect scenario. This is what I wanted. I wanted to meet with her, discuss anything with her, and there was no point in any children, which is what I wanted, because I never wanted interaction with anyone underage nor did I ever ask that." When Siffermann asked how much time he wanted and whether he was okay with the price, he told her that he wanted an hour and he gave her $150. She did not talk about the children at any point, nor did he. After he gave her the money, she told him that she needed to finish brushing her teeth. Defendant thought, "[O]kay, great. It's nothing with minors. It's just going to be me and her." Defendant sat down, and Siffermann went into the

bathroom. The door to the adjoining room opened, and several officers entered. Defendant was arrested and brought into the adjoining room.

¶ 28 After being arrested, defendant gave the officers his cell phone and the password. He was brought to the police station and questioned. When asked about his intent, he told them that he "was there for a massage and/or hand job, if possible."

¶ 29 The trial court found defendant guilty of involuntary sexual servitude of a minor (*id.* § 10-9(c)(2)), traveling to meet a minor (*id.* § 11-26(a)), and grooming (*id.* § 11-25(a)). Defendant filed a motion for a new trial, which the trial court denied. Following a sentencing hearing, the trial court sentenced defendant to seven years' imprisonment on his conviction of involuntary sexual servitude of a minor and to four years on his conviction of traveling to meet a minor, to run concurrently. The grooming conviction merged into the conviction of traveling to meet a minor. Defendant timely appealed.

¶ 30                                   II. ANALYSIS

¶ 31                        A. Sufficiency of the Evidence

¶ 32 Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of involuntary sexual servitude of a minor (*id.* § 10-9(c)(2)), because "the collective testimony of the State's witnesses, that the defendant intentionally solicited sex with a minor, was contradicted not only by his plausible denial but also by the fact that no minor ever existed."

¶ 33 We review a claim of insufficient evidence to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it

creates a reasonable doubt of the defendant's guilt. *Id.* "[I]t is not the function of this court to retry the defendant." *Id.* The trier of fact must assess the credibility of the witnesses, determine the weight to give their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence, and this court will not substitute its judgment for that of the trier of fact on these matters. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

¶ 34                                                    1. Actual Minor

¶ 35    We consider first defendant's argument that, because no actual minor was involved, he could not be found guilty of involuntary sexual servitude of a minor. Section 10-9(c)(2) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/10-9(c)(2) (West 2014)) provides as follows:

> "(c) Involuntary sexual servitude of a minor. A person commits involuntary sexual servitude of a minor when he or she knowingly recruits, entices, harbors, transports, provides, or obtains by any means, or *attempts to recruit, entice, harbor, provide, or obtain by any means, another person under 18 years of age*, knowing that the minor will engage in commercial sexual activity, a sexually-explicit performance, or the production of pornography, or causes or attempts to cause a minor to engage in one or more of those activities and:
>
> ***
>
> (2) there is no overt force or threat and the minor is under the age of 17 years[.]"
>
> (Emphasis added.)

" 'Commercial sexual activity' means any sex act on account of which anything of value is given, promised to, or received by any person." *Id.* § 10-9(a)(2). Whether an actual minor is

required for a conviction under section 10-9(c)(2) of the Criminal Code is a question of statutory interpretation, which we consider *de novo*. *People v. Giraud*, 2012 IL 113116, ¶ 6.

¶ 36    Although the parties maintain that the issue is one of first impression, this court recently considered and rejected the argument now raised by defendant. See *People v. Gaciarz*, 2017 IL App (2d) 161102. *Gaciarz* involved the same undercover operation run by the Aurora Police Department, and the defendant was charged with the same offenses as defendant here. *Id.* ¶ 1. As in the present case, the defendant argued that he could not be found guilty of involuntary sexual servitude of a minor, because no actual minor was involved. *Id.* ¶ 32.

¶ 37    In rejecting the defendant's argument, we began by noting that, although the defendant was not charged with attempting to commit the offense under the separate attempt statute (see 720 ILCS 5/8-4(a) (West 2014) ("A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense.")), section 10-9 of the Criminal Code criminalized the attempted commission of the offense in the same manner as the completed crime. *Gaciarz*, 2017 IL App (2d) 161102, ¶ 31.    There, as here, the indictment alleged that the "defendant knowingly attempted to obtain by any means a person under 18 years of age, knowing that the minor would engage in commercial sexual activity, and that there was no overt force or threat and the minor was under the age of 17 years." *Id.* ¶ 29.

¶ 38    We examined three federal cases involving the prosecution of attempted crimes involving nonexistent minors. *Id.* ¶¶ 33-38; see *United States v. Wolff*, 796 F.3d 972 (8th Cir. 2015); *United States v. Coté*, 504 F.3d 682 (7th Cir. 2007); *United States v. Meek*, 366 F.3d 705 (9th Cir. 2004). In *Wolff*, the defendant was charged with attempted sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591 and 1594. *Wolff*, 796 F.3d at 972. The relevant portion of

§ 1591(a) stated that whoever knowingly " 'recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person,' 'knowing, or in reckless disregard of the fact, ... that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act,' has violated the law." *Id.* at 974 (quoting 18 U.S.C. § 1591(a) (2012)). Under § 1594(a), an attempt to violate § 1591(a) is punishable " 'in the same manner as a completed violation of that section.' " *Id.* (quoting 18 U.S.C. § 1594(a) (2012)). The *Wolff* defendant argued that the indictment was insufficient as a matter of law where there was no actual minor being trafficked. *Id.* The Eighth Circuit disagreed. The court noted that "a crime charged as an attempt has two elements: intent to commit the predicate offense, and conduct that is a substantial step toward its commission." (Internal quotation marks omitted.) *Id.* "[T]he government must prove the requisite intent applicable to the predicate offense, but proof of the ability to actually carry out the predicate offense is not required." *Id.* at 974-75. The court held that the defendant's "subjective intent to engage in a commercial sex act with someone he believed to be a minor female, and the substantial steps he took toward commission of that offense," constituted attempted sex trafficking. *Id.* at 975.

¶ 39　　In both *Coté* and *Meek*, the defendants were charged with violating 18 U.S.C. § 2422(b), which provided in pertinent part:

> "Whoever *** knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in *** any sexual activity for which any person can be charged with a criminal offense, *or attempts to do so*, shall be [punished accordingly]." (Emphasis added.) 18 U.S.C. § 2422(b) (2000).

See also *Coté*, 504 F.3d at 685; *Meek*, 366 F.3d at 718. In both cases, the defendants had communicated with undercover officers, not with actual minors. See *Coté*, 504 F.3d at 683-84; *Meek*, 366 F.3d at 709-10.

¶ 40 In *Meek*, the defendant argued that he could not be found guilty where his communications had been with an undercover officer rather than a minor. *Meek*, 366 F.3d at 717. The Ninth Circuit rejected this argument, holding that an actual minor was not required for an attempt conviction under 18 U.S.C. § 2422(b). *Meek*, 366 F.3d at 717-18. Instead, the belief that a minor was involved was sufficient. *Id.* Similarly, in *Coté*, the Seventh Circuit rejected the defendant's argument that he could not be found guilty if he mistakenly believed that the victim was a minor. *Coté*, 504 F.3d at 687. Noting that "[the defendant] was prosecuted under the *attempt* provision of the statute," the court agreed "with every circuit that has considered the issue, that the Government's burden in such a case is to demonstrate, beyond a reasonable doubt, that the defendant *intended* to undertake one of the proscribed acts with respect to a minor." (Emphases in original.) *Id.* "[I]t was the subjective belief of [the defendant] that he was dealing with an underage girl that had to be proved to the jury." *Id.* at 688. The court thus held that to sustain an attempt conviction the government "was required to prove that [the defendant] acted with the specific intent to commit the underlying crime and that he took a substantial step towards completion of the offense." *Id.* at 687.

¶ 41 We next noted in *Gaciarz* that this court had also previously addressed the commission of attempted crimes involving nonexistent minors. *Gaciarz*, 2017 IL App (2d) 161102, ¶¶ 39-40; see *People v. Scott*, 318 Ill. App. 3d 46 (2000); *People v. Patterson*, 314 Ill. App. 3d 962 (2000). For instance, in *Scott*, we held that the defendant could be found guilty of attempted predatory criminal sexual assault of a child when he engaged in sexually explicit communications via the

Internet with a detective posing as a 12-year-old boy, arrived at an agreed-upon location, and confirmed that he would have had sex with the boy if the boy had been willing. *Scott*, 318 Ill. App. 3d at 49. In *Patterson*, we held that the evidence was sufficient to prove the defendant guilty of attempted aggravated criminal sexual abuse where the defendant communicated via an Internet chat room with an officer posing as a 15-year-old boy, offered to perform oral sex on the boy, and thereafter arrived at the designated location. *Patterson*, 314 Ill. App. 3d at 966.

¶ 42    Based on the above cases, we thus concluded that the lack of evidence establishing the existence of a purported minor did not preclude the State from proving an essential element of the offense in question. *Gaciarz*, 2017 IL App (2d) 161102, ¶ 42.

> "[T]he sufficiency of the evidence in these types of cases turns on whether a defendant intended to commit a specific offense and whether he did anything that constituted a substantial step toward the commission of that offense." *Id.*

We adhere to our reasoning in *Gaciarz*, and we reject defendant's argument that the lack of an actual minor precluded the State from proving the offense at issue.

¶ 43                          2. Intent to Solicit a Minor

¶ 44    We next consider defendant's argument that, in light of his "plausible denial," the State failed to prove beyond a reasonable doubt that he intended to solicit sexual acts from a minor.

¶ 45    As noted, to prove him guilty of involuntary sexual servitude of a minor under the attempt provision of the statute, the State had to prove that defendant intended to obtain an individual under age 17 to engage in commercial sexual activity and that he took a substantial step toward the commission of that offense. *Id.* Here, defendant does not dispute that he committed a substantial step toward the commission of the offense. Indeed, there is no question that $150 was exchanged for sexual activity. Instead, defendant argues that the State failed to

prove beyond a reasonable doubt that he intended to solicit sexual activity from a minor. We disagree. The text messages between defendant and the "mother" make defendant's intent clear.

¶ 46 Although defendant claims that he did not intend to engage in sexual activity with any minor, only their mother, this claim is belied by the text messages. Upon responding to the ad, defendant was quickly informed that a mother was offering her two daughters, ages 14 and 15, for sexual activity. When defendant asked the "mother" if she did things, the "mother" responded, no, she was just teaching that day. When defendant asked the "mother" whether she would be in the room, she responded, no, she would leave and return once the time was up. Defendant's continuation of the conversation, after the "mother" made clear that she was not available for any sexual activity, but that her 14- and 15-year-old daughters were, clearly indicated his intent to engage in sexual activity with persons under the age of 17. Defendant asked what the rate was and what "they" were able to do, and the "mother" responded, "anything I tell them to." Defendant asked whether "they" would do "each other." The "mother" indicated that "15 does fs 14 is still learning but great hands." Defendant asked for clarification that "Fs" referred to "full service." Defendant confirmed that he was a "go" as long as the "mother" could assure him that he was safe.

¶ 47 The fact that defendant continued to engage in the conversation about sexual activity, after the "mother" made clear that she was not available, was sufficient to establish his intent to engage in sexual activity with the daughters. This intent, combined with his arrival at the designated location and his transmission of $150 to the "mother," was sufficient to sustain defendant's conviction of involuntary sexual servitude of a minor.

¶ 48                          B. Admissibility of Text Messages

¶ 49    Defendant's final argument is that the trial court erred in admitting People's exhibit No. 2, the transcript of the text messages compiled by the LETS program.

¶ 50    "A trial court's decision to admit documentary evidence will not be reversed absent an abuse of discretion." *People v. Chromik*, 408 Ill. App. 3d 1028, 1046 (2011). A trial court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the court's view. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001).

¶ 51    As to a proper foundation for admission, text messages are treated like any other form of documentary evidence. See *Chromik*, 408 Ill. App. 3d at 1046-47. A proper foundation is laid for the admission of documentary evidence when the document has been identified and authenticated. *Id.* at 1046. Authentication of a document requires the proponent to present evidence that the document is what the proponent claims it to be. *Id.*; see also Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). The proponent need prove only a rational basis upon which the fact finder can conclude that the document did in fact belong to or was authored by the party alleged. See *People v. Downin*, 357 Ill. App. 3d 193, 203 (2005). The court's "finding of authentication is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied." *Id.* at 202-03. If the court, after serving its screening function, allows the evidence to be admitted, the issue of the document's authorship is ultimately for the jury to determine. *Id.* at 203.

¶ 52    Documentary evidence, such as a text message, may be authenticated by either direct or circumstantial evidence. *Id.* Circumstantial evidence of authenticity includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances. See *id.* Documentary evidence, therefore, may be authenticated

by its contents if it is shown to contain information that would be known only by the alleged author of the document or, at the very least, by a small group of people including the alleged author. See *id.*

¶ 53    Here, we find no abuse of discretion, as there was direct and circumstantial evidence that the text transcript was what the State claimed it to be. Dean was the undercover officer who personally sent and received the text messages contained in People's exhibit No. 2. Dean testified that People's exhibit No. 2 was a transcript of the entire conversation between himself and defendant and affirmed that it had been recorded accurately. Swastek testified that he took defendant's phone after he was arrested. Defendant gave the officers his phone number, and it matched the number that Dean had been texting. Swastek further testified that he confirmed, line by line, that the text messages on the phone matched the text messages on the computer. In addition, defendant was told in the text messages to knock on a certain hotel room door, and he did so. When he entered the room, defendant confirmed with Siffermann that he wanted the full hour and was okay with the rate. In addition to Dean's and Swastek's testimony, defendant testified that People's exhibit No. 2 was a true and accurate representation of the text messages between himself and Dean. Based on the foregoing, we find no abuse of discretion.

¶ 54    We note that defendant seems to suggest, without expressly stating, that the text message transcript needed to be authenticated as a computer-generated record. For instance, he argues that neither Dean nor Swastek was trained to use the LETS program. He further argues that no one testified how the program worked, where the data was stored, or how the program compiled the data. However, defendant cites no authority to support the argument that the transcript should be treated as a computer-generated record.[2]  The failure to cite relevant authority is a

_____

[2] Indeed, other than a string citation to four cases supporting our standard of review, the

violation of our supreme court's rule concerning an appellant's brief and forfeits our consideration of the argument. Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017); *Fortech, L.L.C. v. R.W. Dunteman Co.*, 366 Ill. App. 3d 804, 818 (2006). In any event, as the State points out, "[c]omputer-generated records are the spontaneously created tangible results of the internal electrical and mechanical operations of a computer itself, which are not dependent upon the observations and reporting of a human declarant." *People v. Kent*, 2017 IL App (2d) 140917, ¶ 128. Here, the transcript was dependent on the input of Dean and defendant. Thus, we agree with the State that the transcript was not a computer-generated record.

¶ 55                               III. CONCLUSION

¶ 56    For the reasons stated, we affirm the judgment of the circuit court of Kane County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 57    Affirmed.

---

only case defendant does cite is nonprecedential. See *People v. Augustine*, 2016 IL App (2d) 141158-U. Under Illinois Supreme Court Rule 23(e)(1) (eff. July 1, 2011), such orders "may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." In any event, *Augustine* does not support defendant's argument. In that case, we considered the admissibility of text messages extracted from the defendant's phone and, in so doing, expressly stated that "[t]o establish a proper foundation for admissibility, text messages are treated like any other form of documentary evidence." *Augustine*, 2016 IL App (2d) 141158-U, ¶ 42.