2020 IL App (2d) 180371-U
No. 2-18-0371
Order filed March 27, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-CF-1901 |
| | ) | |
| ERIC L. SMITH, | ) | Honorable |
| | ) | Linda Abrahamson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRIDGES delivered the judgment of the court.
Presiding Justice Birkett and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant was proven guilty beyond a reasonable doubt. Also, the trial court did not abuse its discretion in admitting evidence of text messages or in sentencing defendant to 16 years' imprisonment.

¶ 2    Following a bench trial, defendant, Eric L. Smith, was convicted of unlawful delivery of a controlled substance (720 ILCS 570/401(c)(1) (West 2014)). On appeal, he argues that: (1) he was not proven guilty beyond a reasonable doubt; (2) testimony and exhibits related to text messages should not have been admitted into evidence, because they lacked a proper foundation and were hearsay; and (3) his 16-year sentence is excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On January 22, 2015, defendant was charged by indictment with unlawful delivery of a controlled substance for delivering 1 gram or more but less than 15 grams of a substance containing heroin on October 20, 2014 (720 ILCS 570/401(c)(1) (West 2014)). On August 22, 2016, defendant filed a motion to suppress text messages.

¶ 5                                    A. Bench Trial

¶ 6     Defendant waived his right to a jury trial, and a bench trial commenced on January 6, 2017. The trial court stated that it would address the issue of the foundation for the text messages as it arose during trial.

¶ 7     Officer Brian Oko provided the following testimony. On October 16, 2014, he was assigned to the Kendall County CPAT, which was an undercover narcotics task force. Oko was given the role of being an undercover purchaser of narcotics. Oko was shown a black and white driver's license image of the target of the investigation; Oko identified the image in court. He texted and called the number 630-770-3900 to arrange to buy $200 of heroin and $100 of crack cocaine. The plan was for Oko and Inspector Ryan Melhouse to meet the dealer at an Aldi in Aurora. Melhouse drove an unmarked SUV, and Oko sat in the passenger seat.

¶ 8     On their way to Aldi, the dealer changed the location to the Blue Kangaroo laundromat, which was near the Aldi. The dealer then texted an address that was on a nearby street, but the officers proceeded to the Blue Kangaroo and backed the SUV into a parking spot. A white van pulled in a few parking spots away. Oko observed a tall man come from the area of the van, and the man got into the back driver's side passenger seat of the SUV. Oko identified the individual in court as defendant. When defendant entered the vehicle, he was wearing a NASCAR jacket, and Oko noticed that he had a gold tooth. Oko admitted that he did not put details about defendant's

height, his gold tooth, or his jacket in his police report. Defendant was holding a small clear, plastic bag containing a white, chunky substance. They exchanged greetings and talked about future deals. Defendant asked the officers if they were cops, and he asked Melhouse to try the drugs. Melhouse refused, and defendant left and went back to the white van. Defendant was in the SUV for a total of about 40 seconds. Oko "was staring straight ahead" during much of the encounter instead of staring at defendant; it was "not an uncommon practice not to look at the person you're dealing with" because "[i]t could spook them out." However, Oko turned his head to look over his shoulder at defendant, and he got "a good look at" him to be able to make an identification, which was part of his job.

¶ 9    Later the same day, Oko communicated with defendant through phone calls and texts from the same number. Oko recognized the voice as the same person who had been in the SUV. Oko testified that defendant wanted him to come back the same day, but Oko refused.

¶ 10    On October 17, 2014, Oko attended another briefing and was shown a booking photograph of defendant, which he identified in court. Oko communicated with defendant at the same number through text messages and phone calls. Oko arranged to meet defendant at the Blue Kangaroo on October 20, 2014. That day, Oko drove to the Blue Kangaroo alone in a truck. Oko texted defendant to let him know that he had arrived. Defendant then called and asked him to drive down Fenton Street. Oko parked on Fenton Street and saw defendant walking towards him. They were talking on the phone, and defendant waved his hand above his head, "telling" Oko that he was "right there." Oko recognized the voice to be defendant's voice from their October 16th in-person contact. Oko was not willing to drive down the street for safety reasons, so he left the area.

¶ 11    After leaving, Oko continued to communicate with defendant through texts and phone calls. Defendant asked him to come back to the Blue Kangaroo, and Oko agreed. Oko backed the

truck into a parking spot, and defendant came around the side of the building. Defendant got into the passenger side of the truck, and they greeted each other. Defendant placed a clear plastic bag with a brown powdery substance on the center console of the vehicle. Defendant said that he brought $300 worth of heroin but not any cocaine. Oko put the bag in his pocket and gave defendant $300. At trial, the parties stipulated that the substance weighed 1.8 grams and contained heroin, and they also stipulated to the chain of custody for the substance. Defendant asked Oko to drive him west on Kane Street, but Oko said he would drive defendant only to the exit of the Blue Kangaroo. Defendant got out of the truck there and walked west. Defendant was in the truck for a few minutes total. Oko wrote in his police report that the substance was cocaine, but at trial he described the discrepancy as a typo.

¶ 12    Oko and defendant texted again later on October 20, 2014. They discussed Oko buying $600 worth of heroin the next day. Therefore, on October 21, 2014, Oko communicated with defendant at the same number via text and phone calls. They arranged to meet at the Walmart in Montgomery. During a briefing that day, Oko again viewed defendant's driver's license photo. Oko went to the Walmart with another undercover officer, Jurgita Jankauskaite, driving. Jankauskaite went inside the Walmart, and Oko moved to the driver's side of the vehicle. Oko spoke to defendant by telephone and recognized his voice. Defendant said that he was minutes away. Defendant later got out of a white conversion van and walked over to the driver's side window of Oko's vehicle. He handed Oko a clear plastic bag with chunks of a brown powdery substance and pink capsules. Oko put the bag in his pocket and gave defendant $600. Defendant described how to mix the pink pills with the brown powdery substance, and defendant told him to contact him again for future transactions. Defendant then went back to the conversion van. Oko and defendant texted again later in the day.

¶ 13    The next day, on October 22, 2014, Oko communicated with defendant by text, and they texted and spoke on the phone on October 23 and 24, 2014. They arranged to meet at the Walmart on October 24, 2014. The police planned to arrest defendant that day. When Oko arrived, he saw defendant in the passenger side of a silver car, with another male in the driver's seat. Oko called defendant and recognized defendant's voice in the call. Oko said that he wanted defendant to come to Oko's vehicle, but defendant refused. A SWAT team then approached and arrested defendant.

¶ 14    Throughout his testimony, Oko identified photographs of the text message exchanges he had with the number 630-770-3900. Defendant objected based on foundation and hearsay, and the trial court overruled the objections.[1]

¶ 15    Ryan Melhouse provided testimony consistent with that of Oko regarding the events of October 16, 2014, including that he viewed a photograph of defendant at the briefing. He further testified that on that day, he saw defendant exit the white van and approach the SUV, and he recognized defendant from the picture at that point. Defendant got into the back driver's side seat of the SUV. Melhouse turned around and looked at defendant. He was bald and was wearing a U.S. Navy jacket. Melhouse identified defendant in court as the individual he saw. After exchanging greetings, defendant asked Melhouse if he had a crack pipe. Melhouse said that he did not, which made defendant hesitant to deal with the officers. Defendant was in the SUV for less than two minutes, and Melhouse did not see him with a cell phone. Melhouse did not have an opportunity to observe defendant's hands when he was inside the vehicle.

---

[1] The trial court sustained one objection, to the State's question asking about "the nature of " certain text messages.

¶ 16    Sergeant Jurgita Jankauskaite testified that she was assigned to surveillance on October 20, 2014. She saw the undercover vehicle parked in the Blue Kangaroo parking lot, and she saw a tall black male walking east on Fenton. She could not see the man's face. Jankauskaite later saw the man get inside the passenger side of the undercover vehicle, and subsequently get dropped off at the end of the parking lot.

¶ 17    Master Sergeant Joseph Stavola testified that he participated in defendant's arrest on October 24, 2014. The police found a few cell phones in the vehicle, but they did not find any narcotics in the car or on defendant's person. Stavola identified defendant in court as the person the police arrested in the Walmart parking lot.

¶ 18    After the State rested its case, defendant moved for a directed finding, which the trial court denied on February 23, 2017. Defendant declined to testify, and the defense did not call any witnesses.

¶ 19    The trial court found defendant guilty. On the subject of identification, the court stated:

> "[W]ith respect to the ID, considering all of the circumstances of the ID, based on proximity of the witnesses *** the circumstances under which the observations were made, the ability to observe by the officers particularly in the car and by the arresting officer on the last date they were particularly close ***
>
> I also believe that the fact that the people making observations as police officers understand that part of their job is to figure out who it is that they are seeing. They were briefed ahead of time, shown a picture of Eric Smith who sits here this afternoon. He was identified by three witnesses in court.
>
> * * *

I do think that the State has shown beyond a reasonable doubt that the same individual was involved on all four occasions. It was the same person that Oko saw three times before this particular defendant showed up on 10/24 and was arranged by Inspector Oko in the same way at all times. And based on all of the circumstances, I do believe that the State has shown identification, as well as all of the remaining essential elements beyond a reasonable doubt."

¶ 20     On March 24, 2017, defendant filed a motion for judgment *n.o.v.* or for a new trial, which the trial court denied on May 19, 2017. It then proceeded to a sentencing hearing.

¶ 21                                B. Sentencing Hearing

¶ 22     At the sentencing hearing, Master Sergeant Stavola testified about the meaning of the text messages. He also testified that the street value of heroin was approximately $100 per gram.

¶ 23     Defendant's mother, Dorothy Smith, testified that defendant was a "pretty good kid" who got along with his three siblings and neighborhood children. The family did not have much money, but defendant would sometimes help out by cutting grass to earn money. He attended school until ninth grade. Defendant loved his children and got along with them.

¶ 24     Defendant testified that he was 34 years old and had seven children. Defendant started using marijuana daily when he was 13 or 14 years old. He started using cocaine when he was about 21; heroin when he was about 30; and ecstasy prior to being incarcerated. Defendant was currently a trustee inmate at the Kendall County Jail, which gave him more responsibilities and benefits than other inmates. Since becoming a trustee, he had not committed any jail violations.

¶ 25     Defendant testified that he had a 2006 aggravated sexual abuse conviction against Shannon Dorvil, but he later went on to have three children with her. He had not finished high school, though he hoped to get his GED. Upon being released, he wanted to better his life by working for

his friend's new trucking company. Defendant last had a job about three years ago, and prior to that job, he did not have a job for 12 years. Defendant admitted that he did not pay child support during that time.

¶ 26    The State argued that defendant's criminal history required that he be sentenced as a Class X offender, with a sentencing range of between 6 and 30 years' imprisonment. It also argued that he was extended-term eligible, though the State was not asking for an extended-term sentence. It argued that defendant had eight prior felony convictions as an adult and one as a juvenile; that he had numerous other convictions; that the sentence was necessary to deter others from committing the same crime; and that defendant did not have a relationship with some of his children. It asked that the trial court sentence defendant to 18 years' imprisonment.

¶ 27    Defense counsel argued that 42 of defendant's prior offenses were for driving while on a suspended license, and that a lot of others were misdemeanor offenses that took place when he was 17 or 18 years old. He argued that the criminal sexual assault conviction was based on Dorvil being 16 or 17 years old when defendant was 20 or 21, and that defendant later had three children with her. Counsel argued that in the 32 months that defendant had been incarcerated, he had no violations and had risen to the level of trustee. Counsel argued that a long sentence would cause excessive hardship to defendants' seven children and asked that the trial court impose a "low sentence."

¶ 28    In allocution, defendant stated that he was not a bad person and wanted to be there for his children. He asked that he be sent somewhere where he could get drug treatment and turn his life around.

¶ 29    The trial court sentenced defendant to 16 years' imprisonment followed by 3 years of mandatory supervised release. It stated as follows. It had considered all relevant factors in

aggravation and mitigation but wanted to highlight a few of them. Defendant had a lengthy criminal history. Relevant to his current offense, defendant had a 1997 conviction for manufacturing and delivery of a controlled substance; a 2002 conviction of possession of a controlled substance; and a 2007 conviction for manufacturing and delivery of a look-alike substance. He also had at least 40 offenses for driving while license suspended, and a violation of the sex offender registry, which suggested that he was not a "rule follower." He was doing "an exemplary job" while incarcerated. However, the delivery of drugs such as heroin was considered by the legislature as the type of crime that was most damaging to Illinois citizens and warranting the most severe penalties. See 720 ILCS 570/411(1) (West 2016). The evidence supported the assessment that defendant was a dealer who used drugs, as opposed to an addict who dealt drugs. Defendant's absence from the lives of his children was hard but it would not "seem to be something that is going to change the relationship that [he had] with them up to this point, generally."

¶ 30    Defendant filed a motion to reduce his sentence on June 16, 2017, arguing that the sentence was excessive. The trial court denied the motion on May 14, 2018, stating that it had considered all relevant factors in aggravation and mitigation, including defendant's rehabilitative potential. Defendant filed a notice of appeal the same day.

¶ 31                                II. ANALYSIS

¶ 32                         A. Sufficiency of the Evidence

¶ 33    Defendant first argues that there was insufficient evidence to prove him guilty beyond a reasonable doubt of unlawful delivery of a controlled substance.

¶ 34    When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*,

443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). "Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt." *People v. Gray*, 2017 IL 120958, ¶ 36. We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *Id.* ¶ 35.

¶ 35     Defendant argues that there was no physical evidence or inculpatory statements tying him to the crime, and that the identification evidence, which was the only evidence suggesting his guilt, was unsatisfactory. He recognizes that Oko and Melhouse testified that the person who entered the undercover SUV on October 16, 2014, was the same person that they had viewed in a black and white driver's license photograph shown at the briefing. However, he argues that the photo presents a blurry and non-descript headshot of a black man of indeterminate age, height, and weight, which made the officers' identifications doubtful. Oko saw a different, black and white booking photograph of defendant at the briefing before the October 20, 2014, encounter, but defendant argues that the photograph looks nothing like the driver's license photograph and appears to be a much younger version of defendant. He asserts that the officers were predisposed to believe that he was the suspect, and it did not necessarily follow that he was the person who actually showed up on October 16, 20, and 21, 2014.

¶ 36     Defendant additionally argues that during the October 16, 2014, transaction, he was allegedly in the car for only between 40 seconds and two minutes. Defendant contends that although Melhouse insisted that he got a good look at the suspect, Melhouse did not recall anything

particular about the man's facial features. He argues that Oko barely turned around in his seat and instead looked forward so as not to "spook" the suspect. Defendant maintains that the officers also disagreed about what the man was wearing, with Oko testifying that it was a NASCAR jacket and Melhouse describing it as a U.S. Navy Jacket.

¶ 37    Defendant cites *People v. Yarbrough*, 67 Ill. 2d 222, 226 (1977), where our supreme court stated that where identity is at issue, the testimony of one witness is sufficient to convict if the witness is credible and viewed the accused under circumstances that would allow a positive identification to be made. Defendant also cites *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), where the Supreme Court stated that the factors to be considered in the admissibility of identification testimony are (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the length of time between the crime and confrontation.

¶ 38    Regarding the first factor, defendant argues that Oko and Melhouse had a very limited opportunity to view the suspect on October 16, 2014. For the second factor, defendant maintains that the officers' degree of attention was similarly lacking, as they disagreed about what the suspect was wearing and did not describe him in their police reports. He argues that they also did not agree whether the suspect was holding a bag of drugs during the encounter. Defendant contends that Oko's lack of ability to pay attention to detail is further highlighted by his statement in his police report that he bought $300 of cocaine, instead of heroin, on October 20, 2014.

¶ 39    For the fifth factor, defendant argues that there was no question that the officers would identify him in court as the person that they interacted with, as he was the target of this drug investigation. Defendant maintains that for this reason, and because the identification occurred 2½

years after the transaction, the officers' certainty in their courtroom identification should carry little weight.

¶ 40    Defendant additionally highlights that the police found no drugs on him, on the vehicle's driver, or in the vehicle in conjunction with the arrest, even though defendant was ostensibly there to sell more drugs to Oko. He further argues that they were in a Toyota sedan, whereas the suspect had previously been seen entering or exiting a white van. Defendant asserts that this case also relied heavily on Oko's testimony about the phone calls and texts that he made to 630-770-3900, but the State presented no evidence that defendant was associated with that number or that a cell phone with that number was recovered at the time of his arrest.

¶ 41    We conclude that there was sufficient evidence of identity to prove defendant guilty beyond a reasonable doubt. Defendant does not dispute any of the elements of unlawful delivery of a controlled substance as charged (see 720 ILCS 570/401(c)(1) (West 2014)), other than the State failed to prove identity, *i.e.*, that he was individual who sold Oko heroin on October 20, 2014. He correspondingly disputes that he interacted with the officers on October 16 and 21, 2014.

¶ 42    The "testimony of a single witness is sufficient to convict if the testimony is positive and credible ***." *Gray*, 2017 IL 120958, ¶ 36.  An eyewitness's testimony will be found insufficient only where no reasonable person would accept it beyond a reasonable doubt; we will not reverse a conviction just because the evidence is contradictory or because the defendant claims the witness was incredible.  *Id.*

¶ 43    Here, Oko's identification of defendant did not come from a momentary glance but rather was the result of repeated encounters. First, Oko viewed a driver's license photograph of defendant before his initial in-person contact with defendant. Although defendant describes the photograph as blurry and nondescript, the individual's central features are visible, and the trial court had the

opportunity to view the photograph and make its own assessment. Considering the first two *Manson* factors, Oko testified that defendant was in the car for only about 40 seconds and that Oko looked straight ahead much of the time, but he also testified that part of his job was to make an identification, and that and he got "a good look at" defendant. Oko further spoke to the dealer on the phone later the same day and recognized the voice as the same person who had been in the SUV.

¶ 44 The following day, Oko saw a booking photograph of defendant, which the exhibit shows is much larger and clearer than the driver's license photograph, and which the trial court had the opportunity to assess. On October 20, 2014, Oko spoke to defendant on the phone and recognized his voice. Later that day, defendant got into the passenger seat next to Oko and they greeted each other, which would have given Oko an even clearer view of defendant. Oko purchased heroin from defendant during that encounter, and he also drove defendant to the end of the parking lot. Although Oko wrote in his police report that he purchased cocaine from defendant, he explained the discrepancy as a typo, and the parties do not dispute that the substance was in fact heroin.

¶ 45 On October 21, 2014, Oko again viewed the driver's license photograph of defendant. Oko spoke to him on the phone and recognized his voice. Oko then drove to Walmart, where defendant walked to the driver's side window of Oko's vehicle, which again would have given Oko an unobstructed, close-up view of defendant. Defendant also stayed long enough to explain how to mix the pills with the powdery substance. The following day, Oko drove to Walmart a second time, saw defendant in the passenger side of a car, and recognized his voice on the phone.

¶ 46 Although defendant argues that Oko was predisposed to believe that he was the suspect based on viewing photographs of defendant, this argument is not persuasive given that Oko had many in-person encounters with defendant and also spoke to him many times on the phone. Also,

Oko testified that part of his job was to be able to make an identification of the suspect, so it follows that he would have been seeking to confirm or deny that the police had the correct target. This also relates to the fourth and fifth *Manson* factors, in that Oko was trying to identify defendant from the beginning of the undercover operation, as opposed to more typical scenarios where a crime victim is trying to identify a perpetrator after a crime has occurred. That being said, Oko additionally identified defendant in court.

¶ 47    Added to Oko's identification of defendant was that a second witness, Melhouse, also independently identified defendant. He testified that he saw the driver's license photograph on October 16, 2014, and recognized defendant from the photograph before defendant even got in the officers' SUV. Melhouse testified that he additionally turned around and looked at defendant after defendant entered the vehicle. Melhouse further identified defendant in court.

¶ 48    For the third *Manson* factor, the fact that Oko and Melhouse did not detail defendant's appearance in their police reports is understandable given that the police had already targeted defendant and had photographs of him. Although they disagreed about what type of jacket he was wearing, "where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable." *Gray*, 2017 IL 120958, ¶ 47. This is especially true here, as the inconsistency is between the testimony of two witnesses, as opposed to Oko's own testimony. It is not an inconsistency that Oko saw defendant holding a plastic bag with suspected drugs on October 16, 2014, and Melhouse did not, because Melhouse testified that he did not see defendant's hands.

¶ 49    Finally, the fact that defendant was not found with drugs on October 24, 2014, that he was in a different car, and that the State did not present any evidence that one of the cell phones found

in the vehicle was connected to the 630-770-3900 phone number were all collateral matters that had no meaningful impact on the identification testimony.

¶ 50    In sum, given the number of in-person encounters and phone conversations Oko had with defendant, along with Melhouse's corroborating testimony, and viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that there was sufficient evidence to prove beyond a reasonable doubt that defendant was the person who sold heroin to Oko on October 20, 2014.

¶ 51                                    B. Text Messages

¶ 52    Defendant next argues that the trial court erred in admitting photographs and testimony about text-message conversations, because the State failed to present a proper foundation to authenticate the text messages, resulting in the messages also being improper and prejudicial hearsay. Defendant argues that the State never presented a proper foundation to authenticate the messages in that the State: presented no evidence that defendant owned or used the phone from which the messages were sent; never introduced phone records connecting him to the phone; presented no testimony that anyone saw defendant sending text messages from the phone; and generally provided no evidence explaining why he was necessarily the texts' author. Defendant argues that this evidence was prejudicial because it was extensively used to prove that he was the person arranging to sell drugs to Oko.

¶ 53    Defendant analogizes this case to *People v. Watkins*, 2015 IL App (3d) 120882. There, a police search turned up a cell phone in a drawer with drugs in a common area of a house where defendant and five other people were present. *Id.* ¶¶ 11-12, 38. The only evidence that the State presented to authenticate the text messages found on the phone was that the phone was found in the same house as the defendant, and some of the message referred to, or were directed at,

"Charles," which was the defendant's first name. *Id.* ¶ 38. The State introduced the evidence to show a connection between the defendant and the drugs found in the same drawer. *Id.* The appellate court ruled that the trial court erred in allowing the testimony and photographs of text message conversations into evidence, because they were not sufficiently authenticated. *Id.* Specifically, there were no cell phone records or eyewitnesses indicating that the cell phone belonged to or had been used by the defendant, and there were no identifying marks on the cell phone itself or on its display screen to show the same, other than possibly the references to "Charles" in the text messages. *Id.* The appellate court further concluded that the erroneous admission of the text messages was not harmless error, because it went to the heart of the main charge of drug dealing, and because it was a constructive possession case where drugs were found in the common area of a residence with multiple inhabitants. *Id.* ¶ 39.

¶ 54 Defendant argues that the instant case is similar to *Watkins* in that the State presented no direct evidence connecting him with the number 630-770-3900; no witness testified that defendant owned or used a phone with that number; and no one testified that they saw defendant sending texts to Oko. Defendant argues that the only suggestion of a connection was Oko's testimony that he was speaking with the suspect at that phone number when the suspect was walking down Fenton Street and waving his hand at Oko, and Oko identified the suspect as defendant. Defendant argues that this still does not establish that the person sending the text messages was the person with whom Oko engaged in a drug transaction. Defendant contends that the erroneous admission of the evidence was not harmless, because the State used the evidence to persuade the trial court that defendant was the person sending the texts and arranging the drug transactions with Oko. Finally, defendant argues that the State's failure to authenticate the texts also resulted in the text messages being improper hearsay that prejudiced his right to a fair trial.

¶ 55    The State responds that this case is more analogous to *People v. Walker*, 2016 IL App (2d) 140566. There, the defendant was found guilty of four drug transactions. *Id.* ¶¶ 1, 9. On appeal, he challenged the sufficiency of the evidence as it related to the last transaction, which was arranged entirely through text messages. *Id.* ¶¶ 9-10. The defendant argued that the State failed to prove that he owned the telephone associated with the number, and that the evidence showed that at least one other person had access to the phone. *Id.* This court disagreed, stating that the defendant's "consistent use of the telephone with the 4617 number for [prior] voice communications [was] compelling circumstantial evidence that [the] defendant sent the text messages" that the undercover officer received on the date of the drug transaction at issue. *Id.* ¶ 12.

¶ 56    The State argues that, as in *Walker*, defendant's consistent use of the same phone number in multiple transactions to communicate with Oko was compelling circumstantial evidence that defendant sent the text messages received by Oko on October 20, 2014, when the heroin delivery at issue occurred. The State highlights that Oko testified that he recognized defendant's voice through his numerous conversations with him, both in person and over the phone, and Oko contacted defendant at the same phone number every time he arranged drug sales with him.

¶ 57    The State argues that this case is distinguishable from *Watkins* because in that case, there were no eyewitnesses who saw the defendant using the phone, and the phone's only connection to drugs was that it was found in a drawer with drugs. The State maintains that here, in contrast, Oko directly observed defendant waving at him while communicating with him on the phone, using the same phone number defendant had used in all of their previous and subsequent communications. The State argues that Oko also recognized defendant's voice in their phone conversations.

¶ 58    Defendant responds that *Walker* is distinguishable because the issue there was the sufficiency of the evidence, rather than the foundation for the admissibility of the text messages.

He argues that the defendant in *Walker* also did not dispute that he was the person with whom the undercover officer was speaking on the first three occasions, whereas he does. Last, defendant argues that Oko's testimony that he saw defendant waving at him is doubtful because Jankauskaite was conducting surveillance on that occasion and did not mention seeing the suspect speaking on the phone or waving.

¶ 59 Before a document may be entered into evidence, a party must lay a proper foundation. *People v. Kent*, 2017 IL App (2d) 140917, ¶ 86. The foundation necessary to admit text messages is the same as the foundation needed for other forms of documentary evidence, in that the document must be identified and authenticated. *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51. To authenticate a document, the proponent must present evidence that the document is what the proponent claims it to be. *Id.* As stated by the Illinois Rules of Evidence, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ill. R. Evid. 901(a) (eff. Sept. 17, 2019). "The proponent need prove only a rational basis upon which the fact finder can conclude that the document did in fact belong to or was authored by the party alleged." *Ziemba*, 2018 IL App (2d) 170048, ¶ 51. A text message may be authenticated by either direct or circumstantial evidence. *Id.* This is "routinely the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that the item is, in fact, what its proponent claims it to be." *Kent*, 2017 IL App (2d) 140917, ¶ 86.

¶ 60 If the evidence is authenticated, it simply means that there is sufficient justification for presenting the evidence to the trier of fact. *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 76. The opposing party may still contest the writing's genuineness, and it is the trier of fact's role to determine the ultimate issue of authorship. *Id.* We will not reverse a trial court's decision

to admit documentary evidence absent an abuse of discretion. *Ziemba*, 2018 IL App (2d) 170048, ¶ 50. An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the same view. *Id.*

¶ 61 We conclude that the trial court did not abuse its discretion in allowing the text messages into evidence. We agree with the State that there was significantly more evidence connecting defendant to the cell phone number (and thus the evidence of the text message conversations) than in *Watkins*, where there was only a tangential link between the phone and the defendant. Here, in contrast, Oko testified that he called and texted the phone number on October 16, 2014, and arranged to buy drugs that day, and that defendant was the person who came to the pre-arranged location, got into the officer's vehicle, and discussed the transaction with them. Oko called and texted the number again later that day and recognized defendant's voice from their in-person meeting. On October 17, 2014, Oko again texted and called the same phone number, and he arranged to buy drugs on October 20, 2014. On that day, while still on the phone with defendant, Oko saw defendant walking towards him, and defendant waved his hand above his head, "telling" Oko that he was "right there." Thus, as the State points out, Oko directly saw defendant while talking with him at the phone number in question. Oko continued to communicate with defendant later that day through texts and phone calls, which resulted in him purchasing $300 of heroin from defendant. There were further text and conversations on October 21 through 24, 2014, which resulted in Oko purchasing drugs from defendant on October 21, 2014, and defendant's arrest on October 24, 2014.

¶ 62 Thus, there was a great deal of circumstantial evidence linking defendant to the text in question, and the trial court did not err in determining that the circumstantial evidence formed a sufficient foundation to admit the evidence of the text messages. See *Ziemba*, 2018 IL App (2d)

170048, ¶ 51. We agree with the State that this case is similar to *Walker*, in that the use of the phone number for voice communications with Oko was "compelling circumstantial evidence" that defendant also sent the text messages to him. *Walker*, 2016 IL App (2d) 140566, ¶ 12. Although defendant attempts to distinguish *Walker* on the basis that the case was examining the sufficiency of the evidence rather than foundation for the admission of the exhibits, circumstantial evidence is highly relevant in both types of analysis. In this case, the evidence was arguably even stronger than in *Walker*, in that Oko repeatedly used the phone number to arrange drug transactions where defendant arrived at the arranged time and place; Oko recognized defendant's voice on the phone from their in-person encounters; and Oko saw defendant waving his hand while talking to him on the phone. Defendant contests Oko's credibility regarding seeing defendant wave, but it was the trial court's role as the trier of fact to assess Oko's credibility. See *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 54.

¶ 63    Based on our determination that the trial court acted within its discretion in finding that there was a sufficient foundation to connect the text messages to defendant, it follows that the text would not be hearsay, as they would constitute a statement or admission made by a party-opponent. See Ill. R. Evid. 801(d)(2) (eff. Jan. 1, 2011).

¶ 64                                    C. Sentencing

¶ 65    Last, defendant argues that the trial court erred in sentencing him to 16 years' imprisonment.  He argues that the offense's seriousness does not call for a prison sentence 10 years over the minimum Class X sentence and longer than he could receive for a Class 1 felony. Defendant maintains that a delivery of 1.7 grams of heroin to an undercover officer in exchange for $300 is a transaction by a low-level dealer. He argues that it is notable that no other drugs were found on him at the time of his arrest. Defendant argues that the 16-year sentence is also

considerably longer than any sentence he ever received in the past, as his longest prior prison sentence was a six-year sentence for delivering cocaine in 2007.

¶ 66 Defendant further argues that his criminal history does not outweigh the mitigating factors. He argues that the majority of his offenses were for driving without a valid driver's license, and as far as his prior felony convictions, other than a 2002 Class 2 possession offense and the Class X delivery conviction from 2007, none of the convictions was serious enough to warrant a sentence greater than probation. Defendant asserts that it can be inferred that his juvenile and criminal history of drug offenses is related to his longstanding dependence on marijuana and other substances, with drug addiction being a mitigating factor. Defendant points out that he asked for substance abuse treatment during the sentencing hearing, and the trial court ultimately recommended drug treatment in its sentencing order.

¶ 67 Defendant argues that his age is also a factor weighing in favor of a lesser sentence, in that he was 34 years old at the time of sentencing, and recidivism and drug use decline with age. He argues that in the 2½ years he was in jail awaiting trial and sentencing, he was an exemplary inmate and was given extra privileges as a jail "trustee." Defendant argues that the sentence he received does not reflect this sign of his rehabilitative potential. He argues that he discussed goals for his future, including overcoming his addictions, working for his friend's trucking company, and providing for his seven children, whom he loved.

¶ 68 Finally, defendant argues that the trial court failed to consider the financial impact of a 16-year sentence. See 730 5/5-4-1(a)(3) (West 2016) (trial court to consider the financial impact statement of the Department of Corrections during sentencing). According to defendant, with annual incarcerations costs currently averaging $26,331 per year, his 16-year sentence (with day-

for-day credit) will cost Illinois taxpayers about $236,979. Defendant asks that this court reduce his sentence to one closer to the Class X minimum of six years in person.

¶ 69    A trial court has wide latitude in sentencing a defendant as long as it does not ignore relevant mitigating factors or consider improper aggravating factors. *People v. Peltz*, 2019 IL App (2d) 170465, ¶ 29. The weight to be given to these factors depends on the circumstances of each case. *People v. Chirchirillo*, 393 Ill. App. 3d 916, 927 (2009). A reviewing court gives substantial deference to the trial court's sentencing decision because the trial court has observed the defendant and the proceedings and is therefore in a much better position to consider the sentencing factors. *People v. Brown*, 2018 IL App (1st) 160924, ¶ 9. We therefore accord great deference to a sentence within the appropriate sentencing range. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 66. We will not disturb the trial court's sentencing decision absent an abuse of discretion, which occurs only where the sentence is greatly at variance with the law's spirit and purpose, or manifestly disproportionate to the nature of the offense. *Brown*, 2018 IL App (1st) 160924, ¶ 9.

¶ 70    Based on prior drug offenses, defendant's crime was considered a Class X offense, which was subject to a sentencing range of between 6 and 30 years' imprisonment. 730 ILCS 5/5-4.5-25(a) (West 2014). The trial court sentenced defendant to 16 years, which is below the midpoint of the sentencing range. We cannot say that it abused its discretion in imposing this sentence. At the sentencing hearing, the trial court discussed defendant's significant criminal history. The presentencing investigation report lists 2 juvenile offenses and 78 adult offenses. Although defendant argues that many of them were minor driving offenses, the sheer volume of them is significant. More importantly, the trial court highlighted that defendant's criminal history included three other drug offenses. The trial court further noted that the legislature considered the delivery of drugs such as heroin as the type of crime that was most damaging to Illinois citizens and

warranting the most severe penalties (see 720 ILCS 570/411(1) (West 2016)). The trial court characterized defendant as a dealer who used drugs instead of an addict who dealt drugs. Defendant disputes this characterization, but the evidence at trial showed that he was making repeated drug deals with Oko of several hundred dollars each, within days of each other. The trial court recognized that defendant was doing "an exemplary job" while incarcerated and that it would be difficult for him to be absent from his children's lives. However, it discussed the seriousness of the offense and noted that defendant had not previously been significantly involved with his children.

¶ 71    Thus, the trial court discussed its reasoning for imposing the 16-year sentence, which in large part was based on defendant's criminal history. It also noted some of the mitigating factors that defendant asserts on appeal, such as his behavior in prison and that he has children. At the hearing at defendant's motion to reduce his sentence, the trial court specifically stated that it had considered all relevant factors in aggravation and mitigation, including defendant's rehabilitative potential. The trial court is presumed to have considered all relevant factors and mitigating evidence, and it is not obligated to recite and assign a value to each factor. *People v. Williams*, 2019 IL App (1st) 173131, ¶ 21. Therefore, the trial court was not required to specifically state that it had considered the financial impact of defendant's incarceration. Also, a trial court is not required to give greater weight to mitigating factors than to the severity of the offense, and the existence of mitigating factors does not require it to impose a minimum term. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 55. Based on these considerations, a sentence below the mid-point of the sentencing range was not an abuse of discretion.

¶ 72                                III. CONCLUSION

¶ 73    For the reasons stated, we affirm the judgment of the Kane County circuit court.

¶ 74    Affirmed.