**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230634-U

Order filed October 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0634 Circuit No. 19-CF-2681 |
| SHARIDAN C. KOSKI, | ) ) ) | Honorable Michael W. Reidy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Justices Holdridge and Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  (1) The circuit court properly admitted a certified copy of the witness's expunged criminal complaint as impeachment evidence. (2) The State presented sufficient evidence to prove defendant guilty beyond a reasonable doubt.

¶ 2     Defendant, Sharidan C. Koski, argues that (1) the Du Page County circuit court improperly admitted a witness's expunged criminal complaint as impeachment evidence against defendant, and (2) the State failed to prove him guilty beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On December 19, 2019, the State charged defendant by indictment with four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) and two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). The indictment alleged that defendant was over the age of 17 and the victim, A.H., was under the age of 13 when the offenses occurred. The predatory criminal sexual assault of a child charges alleged that defendant knowingly made contact with the sex organ of A.H. with his mouth. The aggravated criminal sexual abuse charges alleged that defendant knowingly touched the breasts and sex organ of A.H., with his hand, for the sexual gratification or arousal of A.H. or defendant.

¶ 5     At the bench trial, Juliet H. testified that in 2010 she lived with her daughter, A.H., and her minor son. A.H. was born on April 23, 2002, and was eight years old in 2010, when Juliet began a dating relationship with defendant. Defendant moved into Juliet's home in 2011. During his residency there, Juliet described occasions when defendant was home alone with her children. In 2015, A.H. told Juliet about inappropriate text messages defendant sent her. Following the disclosure, defendant moved out.

¶ 6     Juliet testified that she continued an intimate relationship with defendant after he moved out, often communicating via phone or text messages. She identified several text messages sent by defendant on October 12, 2019, which said, "the lord will bring your hot daughter into my and [my girlfriend's] life and you'll be able to watch her getting fucked by me while she licks [my girlfriend's] pussy. *** I cannot wait to spread her tight wet pussy apart with my big fucking cock." The text messages continued with defendant stating,

> "I'm open to the idea of having kids with your daughter ***. That maybe [*sic*] your only hope to saving your relationship with your daughter once she starts banging me and giving oral to my number 1.

*** 

I've wanted her ever since I saw her in thigh highs and a skirt walking up your stairs. Then seeing her show herself to me naked was a bonus. Hearing her say 'never stop fucking me' was even more of a turn on…you pointing out her checking out my package when I was in PJ's only heightened my desire for her.

*** She's gonna get what she wants…her drive impresses me more than her body."

Finally, defendant stated, "I can't wait to see her naked again and taste her pussy while she's taking a strap on from [my girlfriend]," "[s]eeing her orgasm will be a highlight of my life," and "I'm going to cum in her pussy and lick it out if she wants."

¶ 7 On cross-examination, Juliet indicated that defendant's October 12, 2019, messages were in response to Juliet's request for a video of defendant. Juliet explained that defendant's statement referring to his "package" referenced an instance when Juliet asked defendant to stop wearing pajamas without underwear around her children. Juliet did not recall A.H. ever wearing "thigh-highs" and a skirt. Following defendant's 2015 text messages to A.H., defendant denied inappropriately touching A.H. When defendant lived with Juliet, she arrived home before defendant and was usually present in the evening. After moving out, defendant rarely spent the night but continued to contribute to household expenses and a cell phone for A.H.

¶ 8 Defense counsel asked Juliet whether she "had a domestic battery" offense against defendant. The State interjected, asserting that it only knew of a previously disclosed domestic battery offense between A.H. and Juliet. Defense counsel clarified that he was "talking about a *** domestic battery where [defendant] is the victim and Juliet is the defendant. That was in

'15." The court allowed the questioning over the State's objection. Juliet did not recall when the incident occurred but she remembered that she consumed alcohol and hit defendant with a belt.

¶ 9       A.H. testified that she was 21 years old at the time of the trial. When A.H. was in elementary school, and "[p]robably about 10 or 11" years old. defendant moved into her house and the assaults first occurred. While defendant lived at the residence, he slept on the couch or in Juliet's bedroom and A.H. had her own bedroom. During that time, Juliet attended school, which provided occasions that defendant was home alone with A.H. A.H. described defendant entering her bedroom when she was lying on her bed. Defendant "would *** touch [her] *** thigh-ish and *** say some stuff ***. And then at some point [her] pants would come off and [defendant] would touch [her] vagina and *** at some point put his mouth on [her] vagina." A.H. clarified that defendant removed her pants and underwear, put his mouth on the inside and outside of her vagina, and used his hands to touch her vagina and breasts under her clothes. A.H. stated that this sexual conduct occurred "between three and five" times. A.H. did not remember the dates or "specifics of each event," but each instance occurred while defendant lived at the residence. Defendant lived with A.H. until "the end of fifth grade, maybe sixth grade" or for "two or three" years. A.H. remembered that defendant had moved out of the house and she was in high school when defendant sent her a text message to the effect of "you're so sexy."

¶ 10      On October 12, 2019, A.H. received an email from defendant with the subject line "You're all grown up, you can handle the truth." The email included an attachment, which A.H. did not view. In the email, defendant stated,

> "I'm highly sexual and I want you too. ***
>
>     So if that still creeps you out I personally don't care but I want to start texting with you if you're mildly interested. You know how to reach me ***.

4

***

You're absolutely beautiful and would be a real object of my affection if you want…

I *** plan to use my money to seduce you…come now or cum later. It's totally up to you.

You are my Naughty Daughter Desire award winner. I love your body and your personality ***. ***

*** Come get some real action and oral to die for from someone who fantasizes about you all too frequently.

I want you. The cat's outta the bag. I wanna taste your pussy again…. your underwear smells amazing.

***

*** I'm waiting patiently to see you, have you, taste you, love you and cum inside your pussy."

¶ 11     On cross-examination, A.H. testified that she was not sure of the exact date defendant moved in and "assum[ed]" she was in "third grade-ish." A.H. agreed that it could have been fourth grade. A.H. recalled her mother leaving A.H. and her brother home alone when she was in third grade and her brother was in fifth or sixth grade. A.H. could not recall when defendant first touched her inappropriately and did not know if she was "11ish or 12ish" A.H. did not remember "each event specifically" and agreed that there may not have been a fourth or fifth incident. A.H. recalled telling Children's Advocacy Center Director Cathy Hundley that defendant began abusing her toward the end of his residence in her home and around the time that defendant gave her a cell phone. A.H. did not recall if this was in sixth or seventh grade. A.H. did not see

5

defendant in her home after 2016. A.H. showed the high school resource officer, James Tanksley, defendant's inappropriate text messages but did not disclose defendant's abuse. Defendant still financially supported her family, and A.H. thought her allegations would not be believed. A.H. denied disclosing the abuse because she wanted to "get [defendant] into trouble."

¶ 12    On redirect examination, A.H. clarified that she "remember[ed] in the three to five times that [the abuse] happened that sexual events of that specific nature would happen and it was usually the same." However, she "couldn't recall a date or what had happened each specific time *** like start to finish." During each event, there was "[c]ontact between [defendant's] mouth and [A.H.'s] vagina and [defendant's] hands and [A.H.'s] vagina and [defendant's] hands and [A.H.'s] breasts."

¶ 13    Naperville police officer Dan Lukensmeyer testified that he responded to a call on April 21, 2019, reporting A.H. as a runaway. Lukensmeyer located A.H. and returned her to Juliet's residence. While en route home, Lukensmeyer observed that A.H. was "[v]ery talkative" and "in a good mood." A.H.'s demeanor immediately changed when Lukensmeyer pulled into Juliet's driveway and A.H. saw defendant nearby. A.H. was "no longer cheery, she was panicked, seemed to be breathing heavy, and seemed to be concerned" about defendant. Eventually, defendant agreed to leave because A.H. did not want to return with defendant there.

¶ 14    Hundley testified that she interviewed A.H. regarding her disclosure of sexual abuse. Hundley also performed a forensic download of defendant's cell phone, which revealed emails sent to A.H. from defendant on October 12, 2019, with the subject line: "You're all grown up, you can handle the truth." The email contained a video attachment showing the messages sent between defendant and Juliet the same day discussing defendant's fantasies involving A.H. Hundley also recovered two deleted searches from defendant's phone for "[a]ge of consent in

6

Illinois" and "Illinois age of consent and statutory rape law" that were visited on November 15, 2019.

¶ 15        Defendant testified that he suffered from bipolar disorder which made him "uneasy and fidgety." Defendant lived at Juliet's residence for three to four years, and during that time, he occasionally drove the children to school. Defendant described Juliet's "problematic" alcohol consumption. Defense counsel then directed defendant to "late 2015," asking if "anything unusual occur[red]?" Defendant responded that Juliet "got drunk and attacked [him] with a belt and was arrested for domestic violence." Defendant believed that A.H. was "maybe 13" and in seventh grade at the time. After the domestic battery, defendant moved out of Juliet's residence between "mid 2016 until December 31st of 2016" but their relationship continued until October 2019. During this time, defendant visited Juliet's residence and occasionally interacted with A.H. Defendant denied sending A.H. text messages in "late 2015" or before moving out of the home.

¶ 16        In 2017, defendant obtained new employment that required him to travel and his communication with Juliet changed to sending "texts of a sexual nature" and sharing "lewd videos." In May 2017, defendant noticed that A.H. "was getting older." Around that time, defendant recalled A.H. "wearing black thigh highs and a black miniskirt and *** walk[ing] up the stairs." Defendant "found [A.H.] attractive" but did not "act" on his attraction because "[A.H.] was underage" and "[he] knew better." In 2018, defendant walked past a partially open bathroom door and saw A.H. "naked getting ready to take a shower." In October 2018, defendant recalled being at Juliet's residence and observing A.H.'s underwear in a basket of dirty laundry. Defendant identified A.H.'s underwear by the size, style, and material. Defendant took the underwear and used it "as a masturbation aid," "smell[ing]" and "lick[ing]" the underwear on

7

more than one occasion. Defendant denied sending A.H. text messages in the fall of 2018. In late 2019, defendant sent A.H. a text message telling her that he stole her underwear.

¶ 17　　On October 12, 2019, defendant and Juliet were sending sexual text messages to each other. Juliet asked defendant to send "[a] masturbation video" of himself. Defendant responded with a series of sexually explicit messages including fantasies involving A.H. Defendant also sent A.H. an email disclosing his fantasies about her, knowing A.H. was 17 years old at the time. Defendant explained that when he wrote, "[t]he cat's outta the bag" he meant that he had told Juliet and A.H. that he "was fantasizing sexually about [A.H.]" When defendant wrote, "I wanna taste *** your pussy again *** your underwear smells amazing" he was referring to the underwear that he had stolen. Defendant explained that he "was in a manic episode and [he] was just running with it." Defendant denied "ever tast[ing] [A.H.'s] vagina," entering her bedroom, rubbing her leg, touching her stomach, removing her pants or underwear, touching her vagina with his "finger or *** fingers" or mouth, putting his tongue inside her vagina, or touching her breasts under her clothing.

¶ 18　　On cross-examination, defendant stated that he moved in with Juliet between 2010 and 2013. Juliet's alcohol consumption and their fighting escalated throughout their relationship. Defendant agreed that "there was at least one physical altercation *** when Juliet hit" him with a belt on his stomach and arm. A "few months after that incident" defendant moved out. Defendant clarified that he moved out "[w]ithin four months" after "that incident." Defendant was "very sure" the incident occurred in "late 2015." The State asked:

"[W]ould it surprise you to learn the incident was actually in 2013?

A. No

***

8

A. *** I'm not sure of the exact time.

Q. You're not sure of when this domestic battery by Juliet against you happened now?"

A. I think it was in 2015.

Q. Okay. So would it surprise you to learn that it actually occurred in 2013?

A. Sure."

¶ 19    The State provided defense counsel with a copy of a domestic battery complaint against Juliet. Defendant objected and the following exchange occurred between the parties and the court:

"[THE STATE]: Your Honor, we just learned of this actually yesterday. Defense counsel *** opened up the door by asking Juliet about this domestic battery, and now they've asked the Defendant about it.

* * *

[DEFENSE COUNSEL]: *** [Juliet's] been under their control this entire time, *** even if that's the case, they didn't provide [the complaint] to me when I walked into this courtroom.

THE COURT: *** [F]irst off, it's not a criminal offense related to this Defendant. It's related to a witness, right. *** Was she convicted of this?

[THE STATE]: No ***.

* * *

THE COURT: *** The defense crossed on it yesterday, right?

[DEFENSE COUNSEL]: We did.

9

***

THE COURT: Well, I guess it begs the question, you would have to have a good-faith basis in which to start the cross-examination; so wouldn't you have had to have known when it happened?

[DEFENSE COUNSEL]: No, Judge, we didn't. We asked [Juliet] if it happened.

THE COURT: Right. But you're basing it off something, right? You're basing it off of a complaint, right?

[DEFENSE COUNSEL]: I suppose, on some level—And all that's fine, Judge; but if they had documentation to that effect—I'll tell you, Judge, the case has been expunged. It doesn't exist, so I don't have access to that record.

THE COURT: Well, how are you prejudiced that they found the record and they know the date now? ***

[DEFENSE COUNSEL]: Because if I had seen [the complaint], I would know about it before I put [defendant] on the stand, Judge.

THE COURT: Well, [defendant] has access to—or he knows this stuff too. This is involving him. The objection's overruled. This is something *** it just came up yesterday, it sounds like, for the first time. It's fair game. I mean, and it *** helps clarify for the Court time frames."

¶ 20    The State showed defendant the same copy of the domestic battery complaint. Defendant identified the complaint as a domestic battery complaint against Juliet, alleging the incident occurred on September 8, 2013. The complaint indicated that Juliet struck defendant with a belt. Again, the State asked defendant whether he moved out a few months after "that" incident.

10

Defendant responded that his relationship with Juliet "was so volatile that it's hard to understand when [he] exactly moved out because [he] wasn't always living there permanently," but agreed that he moved out after "this domestic battery."

¶ 21 The State then presented defendant with an email from Juliet to defendant sent on January 30, 2014. In the email, Juliet indicated that the relationship was over and stated, "I want to thank you for sharing the past three and a half years with me." Defendant did not recall whether the email was a response to their relationship ending. In an email sent on February 13, 2014, Juliet stated: "Message is loud and clear. I'm sorry we couldn't work things out" and "I'm sad. I'm sure you are too. *** Miss you forever." Defendant agreed that Juliet sent the February 2014 email approximately five months after the domestic battery illustrated in the complaint.

¶ 22 As cross-examination continued, defendant agreed that he continued his relationship with Juliet and occasionally stayed overnight at her house after he moved out, bought A.H. gifts, and paid for A.H.'s cell phone. Defendant also agreed he saw A.H. "wearing black thigh highs" in May 2017, when she was 15 years old. Defendant remembered this incident because it was "something [he] admired" and had been "fantasizing about for over two and a half years." A.H. was 16 years old and defendant was 37 years old when he saw her naked in the bathroom. Defendant found this incident "sexually exciting" and remembered it years later, in a text message to Juliet on October 12, 2019.

¶ 23 In rebuttal, the State sought to enter the 2013 domestic battery complaint into evidence. Defense counsel objected, asserting the complaint had not been authenticated and the record of it no longer existed because it had been "purged." The State acknowledged the complaint was not certified and requested a court order to obtain a certification. The court informed defense counsel, "If they get a certified copy, it's a self-authenticating document." The court then issued

11

the order, and the State returned with the complaint certified, which was entered into evidence without objection. The certified complaint indicated that Juliet was accused of committing a domestic battery offense on September 8, 2013, against defendant, in that she "hit him with a belt multiple times across his arms and chest during an argument."

¶ 24        Following closing arguments, the court found defendant guilty of three counts of predatory criminal sexual assault of a child and two counts of aggravated criminal sexual abuse. The court found defendant not guilty of one count of predatory criminal sexual assault of a child, reasoning that A.H. conceded that the fourth or fifth time may not have happened. The court found that, although A.H. wavered on "the number of times and the dates" of the instances of sexual abuse, her testimony was "not fatal" to her overall credibility but supported the court finding defendant guilty of only three instances of sexual abuse. In finding defendant guilty of the remaining counts, the court noted that A.H. consistently stated she was 10 or 11 years old when the abuse started and testified "unequivocal[ly]" and with "sufficient specificity" regarding the type of sexual acts defendant perpetrated, including touching her leg, breasts, and vagina and putting his mouth on the inside and outside of her vagina. The court found defendant's testimony about moving out "[w]ithin four months" after the domestic battery consistent with A.H.'s timeline and the complaint, indicating the incident occurred in 2013, when A.H. was under the age of 13. Additionally, the court found that defendant's messages discussing performing oral sex on A.H. corroborated the specificity of A.H.'s allegations. The court also found that defendant's messages did not just illustrate "twisted, sick, perverse, or depraved fantasies," but instead defendant's "past acts" where he referred to seeing A.H. naked "again" and "tast[ing] [her] pussy again."

12

¶ 25　　　　The court continued by finding A.H. "extremely credible" despite having to testify about "events that were extremely intimate and embarrassing." The court considered the possible motive for A.H. to lie but found that it "[strained] credulity to believe that she would *** make up an elaborate hoax and then just say it was three to five times." The court addressed defendant's credibility and recalled his "reaction when asked about the date of the domestic battery" from Juliet, noting that "[w]hen confronted with the timeframe about [the] domestic battery, his house of cards fell apart." The court did not find defendant credible when he denied the allegations. The court found defendant's claims incredible in light of his admissions that he had "fantasies of threesomes, about polyamorous relationships" with A.H., a "predilection or preference" for A.H., and used A.H.'s underwear for his sexual arousal.

¶ 26　　　　Defendant filed a motion for a new trial and an amended motion for a new trial, which ultimately raised an allegation that the court erred in admitting the complaint "where the State failed to lay a proper foundation for its admission, resulting in improper impeachment" and the court "placed undue weight on its relevance as related to Defendant's credibility at trial." Specifically, defendant argued that the State failed to link the event that defendant testified about to the "certified copy of a document." Additionally, defendant contended because the complaint had been expunged, there was insufficient information to establish that the complaint "was the case that everybody was referring to on the stand."

¶ 27　　　　The court denied defendant's motions, stating "[t]he case really came down to an issue of credibility and the Court found that [A.H.] was more credible than defendant." Regarding the complaint, the court stated:

　　　　　　　"[I]t stands to reason that if a person takes the stand and they're confronted with a document—and the thing was [defendant] expressed on his direct examination the

13

certainty which he had that this was the timeline based upon this particular incident. And then what happens is when he's shown a different time frame or a different date, that's where the Court found that that timeline *** was to his detriment and also to the corroboration of the State's case in chief."

The court sentenced defendant to an aggregate term of 24 years' imprisonment. Defendant appeals.

¶ 28                                    II. ANALYSIS

¶ 29                              A. Impeachment Evidence

¶ 30        On appeal, defendant first argues that the circuit court improperly admitted a certified copy of the witness's expunged criminal complaint as impeachment evidence. Specifically, defendant sets forth several points supporting this contention, including: (1) the State should not have had access to an expunged complaint; (2) the State failed to establish the relevance of the complaint; (3) the State failed to establish "sufficient foundation;" and (4) the court improperly weighed the complaint when determining defendant's credibility.

¶ 31        At the outset, the State contends that defendant forfeited this issue by failing to specifically include the contention in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appeal, a defendant must raise it both at trial and in a written posttrial motion). The record shows that the court permitted defendant to amend his original motion for a new trial to include the issue at the hearing on the motion. We conclude defendant's objections are sufficient and avoid the procedural bar of forfeiture.

¶ 32        Additionally, we note defendant concedes that, ultimately, the complaint was certified by the court and properly admitted as a self-authenticated document. See Ill. R. Evid. 902(4) (eff. Sept. 28, 2018). Illinois Rule of Evidence 902(4) provides that extrinsic evidence of authenticity

is not required for a certified copy of a public record. *Id.* The rule defines a certified copy of a public record as "[a] copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, *** in any form, certified as correct by the custodian or other person authorized to make the certification ***." *Id.* Here, the complaint that the circuit clerk certified was a copy of a public record—a criminal complaint against Juliet alleging defendant was the victim of a domestic battery incident occurring in 2013. See *id.* Despite this certification, defendant asserts several arguments of error caused by the admission of the complaint into evidence before it was certified. We will address each in turn.

¶ 33    The circuit court has the discretion to decide whether evidence is relevant and admissible. *People v. Amaya*, 255 Ill. App. 3d 967, 971 (1994). Relevant evidence is admissible at trial if it has a tendency to make the existence of any material fact "more probable or less probable than it would be without the evidence." See Ill. R. Evid. 401 (eff. Jan. 1, 2011). In the context of impeachment evidence, the objective "in any given situation may be to draw into question the accuracy of the witness's perception, recordation, recollection, or narration, or the witness's sincerity" to "aid in ascertaining the degree of credit due a witness." Michael H. Graham, Handbook of Illinois Evidence § 607.1, at 507 (2024 ed.). The trier of fact must determine "when, if at all, the witness's testimony is true, accurate, and correct." Michael H. Graham, Handbook of Illinois Evidence § 607.1, at 508 (2024 ed.). A witness may be impeached with extrinsic evidence that contradicts the witness's testimony on cross-examination, including evidence in documents and recordings and the testimony of other witnesses. See *People v. Terrell*, 185 Ill. 2d 467, 508-09 (1998); Black's Law Dictionary 698 (12th ed. 2024); see also Michael H. Graham, Handbook of Illinois Evidence § 607.2, at 509 (2024).

15

¶ 34    "A proper foundation is laid for the admission of documentary evidence when the document has been identified and authenticated." (Internal quotation marks omitted.) *People v. Price*, 2021 IL App (4th) 190043, ¶ 115. "The requirement of authentication *** is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ill. R. Evid. 901(a) (eff. Sept. 17, 2019). Documentary evidence may be authenticated by either direct or circumstantial evidence. *Price*, 2021 IL App (4th) 190043, ¶ 117. "Circumstantial evidence of authenticity includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances." (Internal quotation marks omitted.) *Id.*; Ill. R. Evid. 901(a), (b)(4) (eff. Sept. 17, 2019). The circuit court's "finding of authentication is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied." (Internal quotation marks omitted.) *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51. The extent of cross-examination into "an appropriate subject of inquiry rests in the sound discretion of the trial court." *People v. Chambers*, 2016 IL 117911, ¶ 75. The court's admission of evidence is reviewed for an abuse of discretion. *In re J.C.*, 2020 IL App (2d) 200063, ¶ 28.

¶ 35    First, there was no error in the State obtaining the expunged complaint. The Criminal Identification Act (Act) (20 ILCS 2630/5.2(a)(1)(E) (West 2018)) states that "Nothing in this Act shall require the physical destruction of the circuit court file, but such records relating to arrests or charges, or both, ordered expunged shall be impounded ***." Impounded documents are maintained and are permitted to be used and inspected by the court, law enforcement, and the State in carrying out their official duties. See *id.* § 13(b). Notably, the purpose of the Act is to protect the charged individual from having an expunged action publicly accessible. See *id.* § 7.

16

In this case, Juliet is the individual to seek protection from the public knowing her prior criminal offense—not defendant. See *id.* Viewing the record through that lens, nothing regarding the admission of the complaint contradicted the purpose and intent of the Act. Therefore, we decline to find the expungement of the complaint as a basis for error for which defendant could obtain relief.

¶ 36        Second, the State established that the complaint was relevant and admissible. The complaint was relevant to defendant's testimony where defendant used a single instance of domestic battery to center his timeline of when he resided with Juliet and moved out of Juliet's residence. Importantly, defendant asserted that the domestic battery incident occurred in 2015 when A.H. would have been at least 13 years old, contesting the age element the State was required to prove in each of the charged offenses. Defense counsel also asserted this timeline when cross-examining Juliet. Therefore, other evidence placing the domestic battery incident in 2013, within the timeline of the alleged abuse, was relevant to the present offense. Given these facts, we find that the complaint questioned defendant's "perception, recordation, recollection, or narration" as extrinsic documentary evidence that the State properly used to dispute defendant's denial that he described a domestic battery incident that occurred in 2013 and not 2015. See Michael H. Graham, Handbook of Illinois Evidence § 607.1, at 507 (2024). While this contradiction did not destroy defendant's credibility entirely, it aided the court's ability to determine if defendant's testimony was "true, accurate, and correct." Michael H. Graham, Handbook of Illinois Evidence § 607.1, at 508 (2024). Therefore, the court did not err in permitting the impeachment evidence. [1]

---

[1]Defendant asserts that we should evaluate the complaint as a business record. We decline to do so where there is no evidence in the record that the State pursued admission as a business record and the

17

¶ 37        Third, the State elicited sufficient identification of the complaint to lay the foundation for its admissibility as documentary evidence for impeachment purposes. Defendant identified the document as a domestic battery complaint against Juliet, alleging the incident occurred on September 8, 2013. The complaint indicated that Juliet struck defendant with a belt. Both defendant and Juliet had personal knowledge of the domestic battery incident and testified consistently that Juliet consumed alcohol and struck defendant with a belt. The facts alleged in the testimony and complaint were distinctive circumstances and mirrored in both the complaint shown to defendant and the certified complaint. See Ill. R. Evid. 901(b)(4) (eff. Sept. 17, 2019).

¶ 38        Additionally, defendant agreed that he moved out after "*this* domestic battery," that "*this* incident [was] very clear in [his] mind," and he was "very sure when *it* happened." (Emphases added.) When the State asked defendant, "would it surprise you to learn *the* incident was actually in 2013?" (Emphasis added.) Defendant was unsure, and the State clarified, "[y]ou're not sure of when *this* domestic battery *** happened now?" (Emphasis added.) The record is clear that the State's entire line of questioning referred to the complaint, or a single instance of domestic battery. Moreover, the State was not required to rule out all possibilities inconsistent with authenticity. See *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994) (prosecutor need not prove beyond any doubt that the evidence is what it purports to be; rather, "the standard *** for admissibility[ ] is one of reasonable likelihood"). The evidence here was sufficient to establish a reasonable likelihood that the domestic battery complaint with the incident date of September 8, 2013, reflected the same domestic battery incident that defendant testified to, despite his belief that the incident occurred in 2015. Viewing the evidence in its entirety, we

<hr>

record supports its admission as impeachment evidence in the form of documentary evidence. See *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005) (an appellate court "may affirm the circuit court on any basis supported by the record").

conclude that the circuit court did not abuse its discretion in finding that the State laid the proper foundation for authenticating the complaint as documentary evidence and permitting its admission.

¶ 39    Importantly, the court's finding that the complaint was authenticated, did not preclude defendant from contesting the genuineness of the writing. See *Ziemba*, 2018 IL App (2d) 170048, ¶ 51. It stands to reason that defendant held personal knowledge of the domestic battery incident and maintained the ability to testify that the document did not reflect the same incident that defendant believed occurred in 2015. Defendant failed to do so. Instead, the entirety of the record indicates that the parties and witnesses referred to a single incident of domestic battery.

¶ 40    Fourth, the court properly considered the impeachment evidence. The court explained that the evidence aided its ability to determine if defendant's testimony was "true, accurate, and correct." Michael H. Graham, Handbook of Illinois Evidence § 607.1, at 508 (2024 ed.). While the court opined that defendant's response when confronted with an alternative date for the domestic battery indicated that defendant had been "caught in a lie," the court did not solely rely on this impeachment when finding defendant's testimony incredible. Instead, the court specifically found defendant incredible when he denied the allegations and found that A.H. was "more credible than the defendant."

¶ 41    Finally, the record demonstrates that the complaint shown to defendant is the same document that is depicted in the record as a certified complaint. Not only did the State reference the complaint when it cross-examined defendant, but the discussion between the parties and the court, having viewed both documents, leaves no room for ambiguity. *Supra* ¶¶ 16-17, 31. Additionally, defendant fails to cite any support for his arguments that there was error in the State asking defendant questions about the complaint before it was certified, the State failing to

19

admit the uncertified complaint, or error due to the lack of a written record ordering certification of the complaint. See *Ramos v. Kewanee Hospital*, 2013 IL App (3d) 120001, ¶ 37 ("The appellate court is not a repository into which an appellant may foist the burden of argument and research."). Therefore, the court did not err by admitting the complaint as impeachment evidence.

¶ 42                                    B. Sufficiency of the Evidence

¶ 43        Next, defendant contends that the State failed to prove him guilty beyond a reasonable doubt of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. Specifically, defendant asserts the court erred in finding that (1) the State proved A.H. was under the age of 13 when the incidents of abuse occurred, and (2) A.H.'s testimony provided sufficient detail required to support his convictions.

¶ 44        When a defendant makes a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Thus, we afford great deference to the trier of fact "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We will not retry a defendant and must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

20

¶ 45    To prove defendant guilty of three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)), the State had to establish that on three occasions defendant knowingly made contact between his mouth and the sex organ of A.H. To prove defendant guilty of two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)), the State had to prove that defendant knowingly touched the (1) breast and (2) sex organ of A.H. with his hand for sexual gratification or arousal of A.H. or defendant.

¶ 46    "Our supreme court has recognized 'it is often difficult in the prosecution of child sexual abuse cases to pin down the times, dates, and places of sexual assaults, particularly when the defendant has engaged in a number of acts over a prolonged period of time.' " *People v. Hinthorn*, 2019 IL App (4th) 160818, ¶ 94 (quoting *People v. Bishop*, 218 Ill. 2d 232, 247 (2006)). To support a conviction:

> "[t]he victim *** must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct, (*e.g.*, lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (*e.g.*, twice a month or every time we went camping). Finally, the victim must be able to describe the *general time period* in which these acts occurred (*e.g.*, the summer before my fourth grade, or during each Sunday morning after he came to live with us) to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not

21

essential to sustain a conviction." (Emphases in original and internal quotation marks omitted.) *Id.*

¶ 47    Here, A.H. testified that she was "[p]robably about 10 or 11" when the first sexual assault occurred and the total number of incidents were "[p]robably between three and five." She also recalled that: (1) defendant entered her bedroom when she was lying on her bed; (2) he "would *** touch [her] *** thigh-ish and *** say some stuff;" (3) at some point "[her] pants would come off and [defendant] would touch [her] vagina;" and (4) defendant would "put his mouth on [her] vagina." A.H. clarified that defendant removed her pants and underwear, put his mouth on the inside and outside of her vagina, and used his hands to touch her vagina and breasts under her clothes.

¶ 48    Moreover, the evidence established that instances of sexual assault occurred while defendant lived at A.H.'s residence and before defendant moved out in early 2014. Importantly, the complaint showed that the domestic battery occurred on September 8, 2013. According to defendant, he moved out "[w]ithin four months" of the domestic battery and within four months of September 8, 2013, or no later than January 2014. See *People v. Spaulding*, 68 Ill. App. 3d 663, 675 (1979) ("the trier of fact is free to believe part of one's testimony without believing all of it"). Further corroborating this timeline were two emails sent by Juliet to defendant, referencing defendant moving out at the end of their relationship. A.H. turned 13 in April 2014. Thus, she remained 12 years old within the timeframe that defendant testified to, satisfying the age requirement for the charged offenses.

¶ 49    A.H.'s testimony mirrors the victim's testimony in *Hinthorn* as to the number of acts and the general time period. A.H. testified that the specific acts: (1) occurred three to five times; (2) each time taking place in her bedroom where she laid on her bed and defendant removed her

22

pants and underwear and used his hand and mouth to touch her vagina; and (3) the assaults began when she was 10 or 11 years old and ended before she turned 13. Accordingly, A.H. sufficiently described "the number of acts committed" and "the *general time period* in which these acts occurred" to assure the criminal acts were committed in the applicable timeframe. See *Hinthorn*, 2019 IL App (4th) 160818, ¶ 94. Therefore, A.H.'s testimony provided sufficient evidence of three instances of predatory criminal sexual assault of a child where she testified that defendant committed the act of putting his mouth on her vagina at least three times. A.H.'s testimony also established sufficient evidence to support two convictions for aggravated criminal sexual abuse where she testified that defendant used his hands to touch both her breasts and vagina for defendant's sexual gratification.

¶ 50    Importantly, the court made credibility determinations regarding A.H. and defendant. The court highlighted defendant's denial of "any of the physical contact or *** touching or penetration" in light of his admissions to "fantasies of threesomes, about polyamorous relationships" with A.H., a "predilection or preference" for A.H., and stealing A.H.'s underwear for his sexual arousal. Additionally, in two instances defendant referred to committing certain sexual acts "again," leading to the reasonable inference that defendant discussed past sexual encounters with A.H., corroborating A.H.'s testimony. Notably, defendant consistently discussed oral sex in his messages, which added further corroboration to A.H.'s testimony. In contrast, the court found defendant incredible "when he denied the allegations." We find no basis in the record to dispute the court's credibility determinations. See *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007) (because the trier of fact is best equipped to determine the credibility of a witness, we afford great deference to such credibility determinations unless they are unreasonable).

¶ 51    Given the evidence presented, we cannot say the trial court's findings of guilt were so unreasonable that they require reversal. Therefore, viewing the evidence in the light most favorable to the prosecution, we hold that sufficient evidence was presented to sustain defendant's convictions for predatory criminal sexual assault of a child and aggravated criminal sexual abuse.

¶ 52                              III. CONCLUSION

¶ 53    The judgment of the circuit court of Du Page County is affirmed.

¶ 54    Affirmed.